## THE ERNST KERN COMPANY, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 104946. Promulgated December 15, 1942.

*Thomas G. Long, Esq.*, and *H. A. Mihills, C. P. A.*, for the petitioner.

*Philip M. Clark, Esq.*, for the respondent.

254

OPINION.

Tyson, *Judge:* The various issues will be discussed in the order in which they have been stated.

## I and II.

To its return for the fiscal year ended January 31, 1936, petitioner appended a memorandum entitled "Information Relating to Reor-

ganization Consummated February 21, 1935," stating therein that it believed the plan as consummated qualified as a tax-free exchange under section 112 of the Revenue Act of 1934. A copy of the plan of readjustment was attached to the memorandum. Accordingly, in its return for the fiscal year ended January 31, 1936, petitioner reported no gain from the transaction and in that return and its returns for the fiscal years ended January 31, 1938, and 1939, it used the cost of the store building and equipment to the realty company as the basis for computing deductions for depreciation on such property. The respondent found that the petitioner had acquired property from the realty company in consideration of the assumption by petitioner of the liability of the realty company on the leasehold bonds, and he held that it realized taxable gain in the amount of $536,578.66 when it issued its debentures and preferred and common stock to the bondholders in discharge of the liability under those bonds; and that the deductions for depreciation should be computed on the basis of the cost of the building and equipment to the petitioner. The issues arising from this action are (1) whether the petitioner realized a taxable gain in the amount of $536,578.66, and (2) whether the amounts allowable for depreciation of the building and equipment should be computed on the basis of the cost of the property to the petitioner or its cost to the realty company.

As regards these two issues the petitioner contends that the transaction constitutes a "reorganization" within the meaning of clauses (C) and (D) of section 112 (g) (1) of the Revenue Act of 1934, and that it also constitutes a transfer of the kind described in section 112 (b) (5) of that act; that, therefore, no gain or loss is to be recognized on the transfer of the various properties to it in exchange for its stock and debentures; and that it is entitled to use the cost of the building and equipment to the realty company as the basis for computing deductions for depreciation thereon. These contentions will be considered in order.

In clause (C) of section 112 (g) (1) it is provided that the term "reorganization" means "a transfer by a corporation of all or a part of its assets to another corporation if immediately after the transfer the transferor or its stockholders or both are in control of the corporation to which the assets are transferred." In section 112 (h) it is provided that the term "control" as used in section 112 means "the ownership of at least 80 per centum of the voting stock and at least 80 per centum of the total number of shares of all other classes of stock of the corporation." The realty company owned leasehold estates which were subject to the lien of a bonded indebtedness. It transferred those estates, which constituted only a part of its property, together with 3,000 shares of the common stock of the petitioner,

to the petitioner, and the petitioner issued to the bondholders 3,090 shares of its common stock, 15,450 shares of its new preferred stock, and its debentures of the face value of $154,500, whereupon the leasehold bonds were canceled. After the completion of the transfer and continuously thereafter until after the consummation of the plan of readjustment, the realty company (the transferor) owned none of the stock of the petitioner; Otto Kern, Ernst Kern, and Wagner, the owners of all of the stock of the realty company, owned 15,000, or 82.9 percent, of the 18,090 outstanding shares of the common stock of the petitioner; and the former holders of the leasehold bonds owned 3,090 shares, or 17.1 percent, of the common stock of the petitioner, together with all of the outstanding preferred stock and all of the debentures of the petitioner. While the stockholders of the realty company owned over 80 percent of the common stock of petitioner at the crucial time, they then owned none of its preferred stock, and thus the requirement of section 112 (h), that there be ownership of "at least 80 per centum of the total number of shares of all other classes of stock," is not satisfied.

In order to establish control to the extent required by the statute the petitioner urges that we treat the former bondholders of the realty company as preferred stockholders of that company. This we can not do. There is no proof establishing the insolvency of the realty company or that the bondholders' interest ever attained the status of a proprietary interest such as was true in *Helvering* v. *Limestone Co.*, 315 U. S. 179. Moreover, clause (C) "contemplates that the old corporation or its stockholders, rather than its creditors, shall be in the dominant position of 'control' immediately after the transfer, and not excluded or relegated to a minority position," *Helvering* v. *Southwest Corporation*, 315 U. S. 194; *Helvering* v. *Cement Investors*, 316 U. S. 527. See also *Mahlon D. Thatcher*, 46 B. T. A. 869, 882.

The petitioner attempts to bring the case within clause (D) of section 112 (g) (1), which provides that the term reorganization means a recapitalization, by an argument based on the assumed premise that in the readjustment there were involved two separate and independent transactions represented by two steps therein, i. e., (1) the assumption by petitioner of the leasehold bond issue and (2) the issuance of the petitioner's debentures and preferred and common stock in exchange for the assumed leasehold bond liability; asserting that the second step constituted an exchange of petitioner's direct assumed liability on the leasehold bonds for its own debentures and preferred and common stock, and that it therefore was a recapitalization within clause (D). We think it obvious that these steps were not independent and separate transactions even if it were true that there was an assumption by petitioner of liability on the leasehold bond issue, which, as we later point out, there was not, because the issuance of petitioner's stock

and debentures was inseparably connected with the cancellation of the bonds and the one step to be taken was entirely dependent upon the other being also taken. The two steps were component parts of a single transaction.

In our opinion, there was not a reorganization within the meaning of either clause (C) or clause (D) of section 112 (g) (1), and we so hold.

However, even if the transaction were a reorganization within the statutory definition of either clause (C) or clause (D), that alone is not enough to require nonrecognition of gain. It would be necessary to further show an exchange of a kind described in section 112 (b) (4), and no such exchange is so shown since the property transferred by realty company to petitioner was not solely, or even partly, for stock or securities in any corporation a party to the reorganization, the realty company having received no stock or securities by reason of the exchange. *Connecticut Power Co.*, 28 B. T. A. 38; *Rudolph Boehringer*, 29 B. T. A. 8; *National Bank of Commerce of Seattle*, 40 B. T. A. 72, 77; affd., 115 Fed. (2d) 857; and *Gutbro Holding Co.*, 47 B. T. A. 374, 379.

The petitioner's next contention is that the transaction falls within section 112 (b) (5), which provides as follows:

No gain or loss shall be recognized if property is transferred to a corporation by one or more persons solely in exchange for stock or securities in such corporation, and immediately after the exchange such person or persons are in control of the corporation; but in the case of an exchange by two or more persons this paragraph shall apply only if the amount of the stock and securities received by each is substantially in proportion to his interest in the property prior to the exchange.

The leasehold estates were transferred by the realty company to the petitioner, together with 3,000 shares of the petitioner's common stock. The realty company received no stocks or securities of petitioner in exchange for its property. The transfer by the realty company was made with the consent of the bondholders and assuming, although not so deciding, that the bondholders, because of their first lien through their trust mortgage on the leasehold estates, and the realty company were transferors of the entire interest in the leasehold estates, yet the requirement of the first clause of section 112 (b) (5) as to control is not met, because the realty company received no common or other stocks and the bondholders received only 17.1 percent of the common stock and all of the preferred stock, the preferred stock having voting rights only to the extent of the election of one director while the common stock had the exclusive right of electing, at least, a majority of the directors. In this situation, ownership to the extent of 80 percent of the voting stock is not here shown as required by section 112 (h).

Also, it is to be noted that the petitioner has not shown the value of the leasehold estates transferred, and we can not assume that the realty company did not own and transfer an interest therein which had some value. But the realty company received no stock or securities of the transferee, while the bondholders received all of the stock and debentures that were issued for the property. Thus there could be no determination on this record that the amount of stock and securities received by each transferor is substantially in proportion to his interest in the property prior to the exchange, within the requirement of the last clause of section 112 (b) (5). *United Carbon Co.* v. *Commissioner*, 90 Fed. (2d) 43; *Blair* v. *Commissioner*, 91 Fed. (2d) 992; *Commissioner* v. *Lincoln-Boyle Ice Co.*, 93 Fed. (2d) 27; *Poncin Corporation*, 27 B. T. A. 328, 333; *Miller & Paine*, 42 B. T. A. 586, 594; *B. Cohen & Sons Co.*, 42 B. T. A. 1137.

In our opinion, the transaction was not a nontaxable transfer within the provisions of section 112 (b) (5), and we so hold.

Since the transaction was neither a reorganization nor a nontaxable transfer, the gain thereon, if any, must be recognized. The respondent in determining the gain of $536,578.66 considered only the acquisition of the leasehold estates and the discharge of the bonded indebtedness thereon. His position is, that the petitioner under the plan of readjustment became obligated to pay the bondholders the entire amount of principal and interest due on their bonds and that the petitioner effected a saving and thereby realized income when it settled that obligation for less than its full amount. *United States* v. *Kirby Lumber Co.*, 284 U. S. 1; *Helvering* v. *American Chicle Co.*, 291 U. S. 426; *United States* v. *Little War Creek Coal Co.*, 104 Fed. (2d) 483; and *Estate of W. R. Whitthorne*, 44 B. T. A. 1234, and authorities cited therein. The parties have stipulated that certain adjustments were consummated on February 21, 1935, "pursuant to the plan of readjustment", including the following adjustment set forth in paragraph 12 (d) of the stipulation:

(d) In lieu of its obligation under the lease the petitioner assumed the payment of the First Mortgage Leasehold * * * Bonds of Kern Realty Corporation. The First Mortgage Leasehold * * * Bonds were cancelled, and in lieu thereof the petitioner issued its securities pro rata to the holders of the $1,545,000.00 outstanding bonds, as follows:

(1) $154,500.00 principal amount of Ten Year Five Per Cent Debentures * * *.
(2) $772,500.00 par value of Six Per Cent Preferred Stock, * * *.
(3) 3,090 shares of common stock * * *.

The statement contained in the first sentence of paragraph 12 (d) has not been found as a fact. This part of the stipulation undertakes to interpret the meaning of a written instrument, i. e., "the plan of readjustment." It is not within the province of the parties to con-

strue the meaning of a written instrument as to the facts to be determined therefrom. The interpretation of the meaning and the construction to be placed upon a written instrument is a question of law, *Dillon* v. *Barnard*, 21 Wall. 430, 437; and the determination of a question of law is for the court, regardless of a stipulation of the parties. *Swift & Co.* v. *Hocking Valley Railway Co.*, 243 U. S. 281; *Estate of Sanford* v. *Commissioner*, 308 U. S. 39, 51; *Case* v. *Los Angeles Lumber Co.*, 308 U. S. 106; *Nelson* v. *Montgomery Ward*, 312 U. S. 372, 376; *Smith* v. *Commissioner*, 59 Fed. (2d) 533; *Nelson Co.* v. *Commissioner*, 75 Fed. (2d) 696, affirming 28 B. T. A. 529; reversed, but not on this point, 296 U. S. 374; *Commissioner* v. *Cummings*, 77 Fed. (2d) 670; *Commissioner* v. *Ehrhart*, 82 Fed. (2d) 338; *First-Mechanics National Bank* v. *Commissioner*, 117 Fed. (2d) 127; *Ohio Clover Leaf Dairy Co.*, 8 B. T. A. 1249; affd. per curiam, 34 Fed. (2d) 1022; certiorari denied, 280 U. S. 588; *William Ernest Seatree*, 25 B. T. A. 396; affd., 72 Fed. (2d) 67; *Volunteer State Life Insurance Co.*, 35 B. T. A. 491, 496; reversed, but not on this point, 110 Fed. (2d) 879; certiorari denied, 310 U. S. 636. In accordance with this rule we turn to an examination of the plan of readjustment and find that it contains no provision for the assumption by the petitioner of the indebtedness of the realty company to its bondholders. With respect to this indebtedness the plan provides only that "the obligations of the Realty Company with respect to its leasehold bonds will be cancelled and in lieu thereof the [petitioner] will issue the following securities pro rata to the holders of the leasehold bonds." The securities so to be issued are specified in the plan to be securities of the classes and amounts described in paragraph (d) above having an aggregate value of $1,081,500, and it is expressly stated in the plan that the holders of the $1,545,000 of bonds should receive for each $1,000 bond one $100 debenture, $500 in par value of preferred stock, and $100 in par value of common stock. It is thus apparent that the plan provided only for the discharge by the petitioner of the outstanding mortgage debt of the realty company through payment by petitioner of $1,081,500 in its securities to the holders of the leasehold bonds and it nowhere provided for the assumption by the petitioner of a liability to pay, to the extent of $1,545,000, the obligation of the realty company on the leasehold bonds. It, therefore, can not be said that, as a matter of fact, such liability was assumed pursuant to the plan of readjustment as, in effect, stated in paragraph 12 (d) of the stipulation and as contended by respondent.

Not only does nothing appear in the plan of readjustment to show that there was an assumption by petitioner of the bonded indebtedness of the realty company, but also there is nothing elsewhere in this record to show such assumption, unless the bare statement in the first sentence of paragraph 12 (d) of the stipulation is regarded as making such a

showing and, as we have pointed out, that sentence is not to be so regarded.

Since neither by the terms of the plan of readjustment nor by other facts of record is petitioner shown to have assumed the payment of the leasehold bonds and interest thereon, but it merely agreed to issue to the bondholders a specified amount of its own debentures and stock in lieu of the cancellation of such bonds, we are unable to say that it realized any gain under the principle of the *Kirby* case, *supra*. When the petitioner issued its debentures and stock to the bondholders in the amounts agreed upon it discharged its obligation in full and not for any lesser sum than that obligation. It, therefore, realized no gain. *Cherokee Co.*, 41 B. T. A. 1212. See also *Des Moines Improvement Co.*, 7 B. T. A. 279; *General Utilities & Operating Co.*, 29 B. T. A. 934; affd., 296 U. S. 200; *Columbia Pacific Shipping Co.*, 29 B. T. A. 964; affd., 77 Fed. (2d) 759; *Pinkney Packing Co.*, 42 B. T. A. 823.

The determination of the respondent that the petitioner realized gain of $536,578.66 is disapproved.

Since we have concluded that there was neither a reorganization nor a nontaxable transfer within the meaning of sections 112 (g) (1) and 112 (b) (5), the petitioner is not entitled to have its allowances for depreciation computed upon the basis of the cost of the store building and equipment to the realty company, under section 113 (a) (7) and (8) of the Revenue Act of 1934. The proper basis, therefore, is the cost of the property to the petitioner. Section 113 (a); *Sacramento Medico Dental Building Co.*, 47 B. T. A. 315, 328. The basis which the respondent used in his determination of a deficiency was $1,542,231.20, the amount of the bond liability alleged to have been assumed, with some adjustments.

The respondent says that he properly measured the cost to the petitioner on the basis of the amount of the leasehold bond liability which it is alleged to have assumed in order to acquire the property; but he suggests that the property may be said to have been acquired for the common stock, preferred stock, and debentures issued to the bondholders, so that, in reality, the cost to the petitioner was the aggregate par value of such stock and debentures, or $1,081,500. The parties have stipulated that the adjusted basis in the hands of the realty company was $1,626,593.54 at January 31, 1935, and $1,620,117.79 at February 28, 1935. Under the pleadings, the only issue presented is whether the petitioner is entitled to the higher basis of the realty company, and the case was tried on the theory that either $1,542,231.20 or the adjusted basis of the realty company was proper, dependent upon whether or not there was a tax-free exchange. The suggestion that the lower basis of $1,081,500 be used was made by the respondent for the first time in his brief, but at no time during this proceeding has he asserted a claim for an increased deficiency on the ground that additional

amounts should be disallowed for depreciation. The transaction of February 21, 1935, involved some considerations passing from the petitioner in addition to the debentures and preferred and common stock, such as, for instance, the cancellation of all obligations between the petitioner and the realty company, the respective amounts of which are not shown, and, in the absence of evidence that those other considerations were of no value, we are unable to find that the cost to the petitioner was lower than that found by the respondent, to wit, $1,542,-231.20; except that there should be eliminated from such amount $3,719.70 which we hereinafter find, under issue IV, to be rent, and $14,663.86 which we hereinafter find, under issue V, should be eliminated in computing the cost of the properties involved for the purpose of depreciation allowances, both of the latter amounts having been included by respondent in determining that the cost to petitioner of the properties was $1,542,231.20.

For the fiscal year ended January 31, 1936, the respondent allowed depreciation on the store building and equipment for the period of eleven months of that year. The properties were acquired by the petitioner on February 21, 1935, and the petitioner therefore is entitled to depreciation for the full period of its ownership, namely, from February 21, 1935 to January 31, 1936. The respondent makes no argument on this issue.

## III.

The question next to be decided is whether the petitioner realized taxable income as a result of cancellation of $80,000 of its indebtedness to the bank. The respondent included that amount in income pursuant to article 22 (a)–14 of Regulations 86.[1]

The petitioner was solvent and the respondent contends that under the rule in *United States* v. *Kirby Lumber Co., supra; Helvering* v. *American Chicle Co., supra;* and *United States* v. *Little War Creek Coal Co., supra,* the petitioner realized taxable income. The assets of the petitioner were freed from the claims of its creditor to the extent of $80,000 without any offsetting liability and, under the authority of the cases just cited, we hold that the respondent's action was proper. See also *Lakeland Grocery Co.,* 36 B. T. A. 289.

The petitioner contends that the cancellation of its indebtedness to the extent of $80,000 was in substance a contribution to petitioner's capital.

---

[1] ART. 22(a)–14. *Cancellation of indebtedness.*—The cancellation of indebtedness, in whole or in part, may result in the realization of income. If, for example, an individual performs services for a creditor, who in consideration thereof cancels the debt, income in the amount of the debt is realized by the debtor as compensation for his services. A taxpayer realizes income by the payment or purchase of his obligations at less than their face value. * * * If a shareholder in a corporation which is indebted to him gratuitously forgives the debt, the transaction amounts to a contribution to the capital of the corporation. * * *

The bank was not a stockholder in petitioner and consequently the last sentence in the cited regulation does not apply to the cancellation of the $80,000 owed by petitioner to the bank. The reasons petitioner assigns in support of his contention that the $80,000 was a contribution to petitioner's capital are that in the negotiations preceding the consummation of the readjustment efforts were made to induce the bank to accept debentures or stock for all, or part, of its debt; that this would have been done if the bank had not gone into a receivership; and that the receiver finally agreed to cancel part of the debt and take a note for the balance provided the new note be given priority over the claims of the bondholders and certain other creditors. We find nothing in these facts to warrant the conclusion that the status of the bank was equivalent to that of a stockholder and that the cancellation of the indebtedness was therefore a capital contribution within the rule set out above.

The action of the respondent in including the amount of $80,000 in income of the petitioner is approved.

## IV.

The next question for determination is whether the petitioner is entitled to a deduction in the amount of $3,719.17 which it paid as rent for the period August 1, 1934, to January 31, 1935. The respondent disallowed the deduction on the ground that it represented part of the purchase price of the properties which the petitioner acquired from the realty company.

During the term of the standstill agreement and up to the time when it was supplanted by the plan of readjustment on February 21, 1935, the petitioner occupied the department store premises under its store lease from the realty company and, in lieu of the rentals reserved therein, it paid to the landlords on behalf of the realty company the rentals which were due them from the realty company as modified by the standstill agreement. Pursuant to the plan of readjustment, which had been formulated on September 19, 1934, and was to become effective as of August 1, 1934, the realty company on February 19, 1935, assigned the leasehold estates to the petitioner, and the landlords, the petitioner, and the realty company on February 21, 1935, signed the "rent agreement," in which the petitioner agreed to pay modified annual rentals to the landlords. The "rent agreement" provides that, "The readjustment of lease rentals * * * shall be effective for a period of ten years from and after the first day of August 1934." The amount sought to be deducted under this issue is the excess of the rentals payable under the "rent agreement" for the period August 1, 1934, to January 31, 1935, over those which the petitioner would have paid under the standstill agreement.

The respondent contends that, as the petitioner acquired all of the right, title, and interest in the property transferred by the realty company, the payments in question must be treated as part of the purchase price of the property, and that, even if they were expenses, they were neither ordinary nor necessary and they were not incurred in carrying on trade or business.

Section 23 (a) of the Revenue Act of 1934 authorizes the deduction of "All the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business * * *; and *rentals* or other payments required to be made as a condition to the continued use or possession, for purposes of the trade or business, of property to which the taxpayer has not taken or is not taking title or in which he has no equity." [Italics supplied.] The term "rental" is to be read in its ordinary and usual sense, and it implies a fixed sum to be paid at stated times for the use of property. *Duffy* v. *Central Railroad*, 268 U. S. 55. The payments in question were clearly of that character. The petitioner acquired the leasehold estates and paid a consideration therefor to the realty company; but it acquired no title to or other equity in the real property. Its status was merely that of a lessee, and the payments of rentals were due from and made by it directly to the landlords for the use of the premises by petitioner in its department store business. The contentions of respondent that the payments represented a capital investment and that they were neither ordinary nor necessary are untenable.

The respondent also contends that the payments are not deductible because they accrued in the taxable year ended January 31, 1935. The "rent agreement" states that it shall be binding only if and when the plan of readjustment is adopted and only if and when all parties have executed the rent agreement; and the stipulation shows that such adoption and execution took place on February 21, 1935, and within the taxable year ended January 31, 1936.

The payments were in fact rent and were proper accruals for the taxable year ended January 31, 1936, and the respondent erred in disallowing the deduction.

In the determination of the deficiencies, the respondent treated the payment of $3,719.17 as part of the cost to petitioner of the assets acquired by it from the realty company for the purpose of computing the deductions for depreciation on the store building and equipment. In view of our conclusion that the payment was a payment of rent, the amount of $3,719.17 should be eliminated from that cost basis in computing such deductions.

### V.

The next question for determination is whether the petitioner is entitled to a deduction of interest in the amount of $14,663.86. The

respondent denied the deduction in determining the deficiency for the taxable year ended January 31, 1936. The deficiency notice stated that the amount was interest accrued on the debentures and on the cumulative dividends on the preferred stock for the period August 1, 1934, to February 21, 1935, and that it was disallowed on the ground that it constituted part of the purchase price of the properties acquired from the realty company. The parties have stipulated that "Under the Plan of Readjustment the petitioner paid $14,663.86 more interest for the period August 1, 1934 to January 31, 1935 than was payable under the standstill agreement."

The respondent asserts that prior to the adoption of the plan of readjustment the petitioner was under no obligation to pay the interest due by the realty company on the leasehold bonds, and he contends (1) that the petitioner can not deduct interest paid on behalf of another, and (2) that the payment was part of the consideration paid for assets of the realty company. The petitioner takes the position (1) that the payment represents an increase, occasioned by the adoption of the plan of readjustment, in the interest payable under the standstill agreement for the period August 1, 1934, to January 31, 1935, and is deductible as interest which accrued on February 21, 1935, and (2) that the obligation is not one of the realty company which was paid by the petitioner.

The nature of the payment must be determined from the facts shown by the record, and, for reasons hereinbefore stated in our consideration of the question of whether or not petitioner assumed payment of the leasehold bonds, we are not bound by the stipulation of counsel characterizing the entire amount as "interest." Also, it may be said that this Court will disregard a stipulated fact if it is contrary to a fact otherwise established from the record. *William Ernest Seatree, supra.*

Under the standstill agreement, the petitioner was required to pay interest to the leasehold bondholders at a reduced rate, but those payments were not made on obligations of the petitioner. They were made on behalf of the realty company and from part of the rental payable by the petitioner to the realty company under the store lease. Under the plan of readjustment the leasehold bonds were canceled and then, for the first time, the petitioner, by issuing its debentures in the amount of $154,500, assumed a direct obligation upon which interest was payable from it to the former leasehold bondholders. The debentures were dated back to August 1, 1934, the effective date of the readjustment, and bore interest at the rate of 5 percent per annum from date.

Whether the payment is deductible as "interest paid or accrued within the taxable year on indebtedness," sec. 23 (b) of the Revenue Act of 1934, depends upon whether it is compensation for "the use

or the forbearance of money" legally owing by the taxpayer, and the obligation on which it is paid must be an unconditional promise to pay a fixed sum at some specific time. *Deputy* v. *du Pont*, 308 U. S. 488; *W. S. Gilman*, 18 B. T. A. 1277.

No specific contention is made here that the preferred stock is anything other than what it is denominated, but in view of the fact that respondent in his determination found that petitioner had included in its return a deduction for interest on preferred stock and denied this deduction only on the ground that it constituted part of the purchase price of the property acquired from the realty company and, inasmuch as on arguments by both parties in their briefs on this question no point was made differentiating interest on the debentures from interest on the stock, we shall consider the question of whether or not it was preferred stock bearing only dividends, or preferred stock bearing interest. The provisions of the preferred stock certificates, as actually issued, have not been shown us, but, so far as we can ascertain their character from the facts set out in the plan of readjustment, under the terms of which the stock was issued, the holders thereof were investors in the corporation and not its creditors. There was, so far as is shown by the plan of readjustment and the whole record, no fixed maturity date for the payment of the principal of the preferred stock and no right in case of dissolution for the holders of that stock to share in the assets with creditors. In the plan the security is denominated "preferred stock" and the payments thereon are described as "dividends"; the dividends on the stock were payable only out of earnings; and the holders of all of such stock as a class had the right to elect one director. In these circumstances we are of the opinion, and so hold, that the preferred stock did not represent an indebtedness of petitioner and the amount paid thereon was not interest within the meaning of the applicable statute. *Jewel Tea Co.* v. *United States*, 90 Fed. (2d) 451; *Dayton & Michigan Railroad Co.*, 40 B. T. A. 857; affd., 112 Fed. (2d) 627; *Pacific Southwest Realty Co.*, 45 B. T. A. 426, and authorities cited therein; affd., 128 Fed. (2d) 815; certiorari denied, 317 U. S. 663; cf. *Meridian & Thirteenth Realty Co.*, 44 B. T. A. 865; reversed, 132 Fed. (2d) 182. That part of the claimed deduction for interest which represented payments made on the preferred stock should therefore be disallowed.

However, with respect to the debentures of petitioner, we are of the opinion, and so hold, that they constituted an indebtedness of petitioner and the amount paid thereon was interest within the meaning of the statute and deductible as such. The liability therefor accrued on February 21, 1935, and within the taxable year. The statute does not require that the indebtedness upon which interest has

accrued and become a liability of the taxpayer must be outstanding during the entire interest accrual period. *Columbia River Paper Mills*, 43 B. T. A. 104; affd., 126 Fed. (2d) 1009; and *Oregon Pulp & Paper Co.*, 47 B. T. A. 772.

In the consummation of the plan of readjustment, the petitioner acquired $3,750 in face value of its own debentures for leasehold bonds of the realty company, thereby reducing its outstanding debentures from $154,500 to $150,750. The interest on the latter amount for the period August 1, 1934, to January 31, 1935, at the rate of 5 percent, which the debentures bore, is $3,768.75, and such amount should be allowed as a deduction. There is no merit in the respondent's contention that the amount of $14,663.86 constituted part of the purchase price of the property acquired from the realty company, and that amount should be eliminated in computing the cost of such properties for the purpose of depreciation allowances.

## VI.

The final question is whether the petitioner is entitled to deduct real property taxes, imposed by the county of Wayne in the amount of $577.48 and by the city of Detroit in the amount of $2,605.64, which the petitioner paid during the fiscal year ended January 31, 1938. The petitioner purchased the property under a land contract dated May 1, 1937, and the equitable title vested in it on that date, *City of Marquette* v. *Michigan Iron & Land Co., Ltd.*, 132 Mich. 130; 92 N. W. 934. So we may, therefore, properly treat it as the owner as of that date. *Pacific Southwest Realty Co., supra.* If, prior to May 1, 1937, any lien for payment of the taxes existed on the real estate conveyed or if the petitioner's vendor was personally liable for the taxes, the deductions must be denied. *Magruder* v. *Supplee*, 316 U. S. 394; *Helvering* v. *Johnson County Realty Co.*, 128 Fed. (2d) 716.

In the consideration which follows of the question of whether petitioner is entitled to deduct the real property taxes imposed by Wayne County, the sections referred to below are as they appear in Michigan Statutes Annotated, vol. 6 (Ed. 1936).

In Michigan, real property must be assessed for taxes in the township or place where situated and to the owner, if known. § 7.3. As to state and county taxes the assessments must be made annually by the supervisors of the several townships, but in cities where provision is made in the charter for some other assessing officer, the assessment must be made by that assessing officer. § 7.10. The supervisor is required to make and complete an "assessment roll" on or before the first Monday in June in each year, setting forth the name of every person liable to be taxed and a description of the real property, its

cash value, and the name of the owner. § 7.24. For counties having a population of more than 500,000, such as is Wayne County, in which the city of Detroit is located, a board of review is provided. § 7.41. On the Tuesday next following the first Monday in June, but not later than the third Monday in June, the county board of review must proceed to examine and review the assessment rolls as prepared by the supervisor, for the purposes, among others, of correcting errors and adding to the roll the names of persons and value of real property omitted from the roll. § 7.43. The assessment roll, with such changes as may have been made by the county board of review, must be returned to the supervisor so that persons assessed may file written objections on or before the fourth Monday in June. § 7.44.

The assessment roll, together with the objections filed, must be returned to the county board of review on or before the Tuesday following the fourth Monday in June and a final determination is then made by the board of the valuation of each description of real property with respect to which objection has been filed. §§ 7.45, 7.46.

The county board of review must complete the assessment roll on or before the third Monday in July, sign and endorse it as the assessment roll of the township for the year in which it had been prepared and affirmed by that board, and return the roll to the supervisor. § 7.47.

Sections 7.80 and 7.81 are as follows:

'§ 7.80. The supervisor of each township or ward, and the assessing officer of each city or village, as provided by law, *shall proceed to assess the taxes apportioned to his township,* or assessment district, according and in proportion to the valuations entered by the board of review in the assessment roll of the township, ward, village or city of the year. * * * [Italics supplied.]

§ 7.81. The taxes *thus assessed shall become at once a debt* due to the township, city, village and county *from the persons to whom they are assessed,* and the amounts assessed on any interest in real property shall, on the first [1st] day of December, for state, county, village or township taxes or upon such day as may be heretofore or hereafter provided by charter of a city, become a lien upon such real property, and the lien for such amounts, and for all interest and charges thereon, shall continue until payment thereof. * * * [Italics supplied.]

With respect to the Wayne County taxes, it is established from the foregoing provisions of the statute: That the time when those taxes became a debt due the county was when the supervisor proceeded to assess the taxes in proportion to the valuations entered by the county board of review on the assessment roll. §§ 7.80 and 7.81, *supra;* that the county board of review did not proceed to examine and review the assessment roll for the purpose of fixing such valuations until on the Tuesday next following the first Monday in June. § 7.43, *supra;* that the time when the taxes became a debt by the supervisor proceeding to assess same in proportion to the valuations entered by the county board of review was subsequent to the Tuesday next following the first Monday in June; and that, therefore, the taxes could not

have become a debt to the county earlier than on the latter date. It is consequently obvious that there existed no debt or personal liability of petitioner's vendor for the payment of the county taxes on May 1, 1937, when the real estate was conveyed to petitioner. It is equally obvious that under § 7.81, *supra*, no lien for such taxes existed on that date. The petitioner is therefore entitled to a deduction of the Wayne County taxes of $577.48. *Magruder* v. *Supplee, supra; Helvering* v. *Johnson County Realty Co., supra.*

With respect to the city taxes on the real estate involved in this issue, we are of the opinion that the vendor became personally liable therefor on April 1, 1937, and prior to its transfer of the real estate to petitioner on May 1 of that year.

The charter of the city of Detroit in Title VI, chapter IV, and both section 7 and 27 make the tax a debt of the owner "from the time of the listing of the property for assessment" by the board of assessors. Section 3 of Title VI, chapter II, of the charter provides that every person owning taxable property shall make a list thereof for the board of assessors, and, in case of failure of such owner to do so, it becomes the duty of the assessors to assess the property upon the assessment roll, which is to be completed by April 1. In the absence of citation to and our inability to find, after diligent search, a contrary holding by the courts of Michigan, we hold that petitioner's vendor became personally liable for the city taxes in question, by reason of the above provisions in the charter, on April 1, 1937, and for this reason petitioner is not entitled to the claimed deduction therefor. *Magruder* v. *Supplee, supra.* The deduction for the city taxes in the amount of $2,605.64 was properly denied by respondent.

On brief, petitioner asserts that under the laws of Michigan there is no personal liability for real estate taxes which can be enforced by proceedings in court, and in support of such assertion he cites *Schaefer* v. *Woodmere Cemetery Assn.*, 256 Mich. 332; 239 N. W. 300, and *Bankers' Trust Co. of Detroit* v. *Russell*, 270 Mich. 568; 259 N. W. 328. Petitioner, although not so expressly stating, apparently seems to thus invoke the principle that there can be no right of the city of Detroit or the county of Wayne, i. e., the debt to them for the real estate taxes, because there was no remedy for the enforcement of such right; but the *Bankers' Trust Co. of Detroit* case, *supra* (1935), cited by petitioner, involving taxes due the city of Detroit on real estate, quotes with approval from the *Schaefer* case, *supra*, as follows: "Taxes on real estate may be collected by distress on goods and chattels ([1 Comp. Laws 1871], § 1003), but if not so collected the tax is returned unpaid and the land sold to make it." Thus there is provided for the city of Detroit and Wayne County a remedy for the enforcement of their right to collect the debt represented by taxes on real estate. We are of the opinion that the method by which collection of such taxes

is enforced is immaterial in determining the existence of the liability.

With regard to the claimed overpayment of $375.80 income tax for the fiscal year ended January 31, 1936, the record is devoid of proof as to when the income tax for that year was paid.

*Decision will be entered under Rule 50.*