Manhattan Soap Company, Inc. v. Commissioner. Oscar M. Burke v. Commissioner. Frank G. Burke, Jr. v. Commissioner.
Manhattan Soap Co. v. Commissioner
Docket Nos. 182, 112632, 112633.
United States Tax Court
1944 Tax Ct. Memo LEXIS 324; 3 T.C.M. (CCH) 257; T.C.M. (RIA) 44092; March 22, 1944
*324 1. Petitioner allowed a deduction of $102,335.58 in 1938 representing processing oil and manufacturer's excise taxes accrued on its books for that year. 2. A compromise payment in 1939 of such taxes, with others for prior years, does not result in taxable income. 3. The proper depreciation allowances for 1938 and 1939 determined. 4. The reasonable amount of officers' salaries paid in 1939 determined. 5. Penalty of 5 per cent for "intentional disregard of rules and regulations" not approved. 6. Forgiveness and cancellation of debts of petitioner officers by petitioner company did not result in taxable income to them. 7. Amounts claimed as entertainment and traveling expenses disallowed. Victor R. Wolder, Esq., 11 W. 42nd St., New York, N. Y., for the petitioners. Harold D. Thomas, Esq., for the respondent. VAN FOSSAN Memorandum Findings of Fact and Opinion The respondent determined deficiencies in the petitioner's income and excess profits taxes as follows: Docket No.
Petitioner
Tax
Year
Deficiency
Penalty
182
Manhattan Soap Co
Income
1938
$17,809.92
Manhattan Soap Co
Income
1939
23,771.98
$1,188.60
Manhattan Soap Co
Excess-profits
1938
11,628.12
112632
Oscar M. Burke
Income
1939
2,517.25
112633
Frank G. Burke, Jr.
Income
1939
5,848.33
*325 The issues in which the petitioner, Manhattan Soap Company, is involved are as follows: 1. (a) The deductibility of $102,335.58 in 1938, representing Federal processing oil and manufacturer's excise taxes, including interest thereon, due for that year (b) Upon the discharge in 1939 of that obligation and similar prior taxes and interest, aggregating in all $319,255.84, for the compromise payment of $35,000 to the Treasury Department, the inclusion in the petitioner's taxable income of the difference between the compromise settlement and the amounts due for such taxes and interest. 2. The proper amount of depreciation allowable in both 1938 and 1939. 3. The deductibility in 1938 of $20,000 representing officers' salaries in excess of the amounts allowed by the respondent. 4. The imposition of a 5 per cent penalty for "intentional disregard of rules and regulations." The issues relating to both individual petitioners, Oscar M. Burke, and Frank G. Burke, Jr., are: 1. The taxability in 1939 of the amounts of $9,852.34 and $21,362.63, respectively, resulting from the cancellation of the petitioners' indebtedness in such amounts by the Manhattan Soap Company. 2. The disallowance *326 of the deduction of $500 to each petitioner as excessive entertainment and traveling expenses. Findings of Fact The petitioner, the Manhattan Soap Company, hereinafter called the company, is a New York corporation with its principal office in New York City. Its income tax return for the year 1938 and the income tax returns of Oscar M. Burke and Frank G. Burke, Jr., hereinafter called the petitioners, were filed with the collector of internal revenue for the third district of New York. The income tax return of the company for the year 1939 was filed with the collector of internal revenue for the first district of Pennsylvania. The company kept its books and filed its income tax returns for the taxable years on the accrual basis of accounting. The company is engaged in the manufacture and sale of toilet and laundry soap. Its leading product is the toilet soap known by the brand name of "Sweetheart", which now ranks fifth in sales in the United States among the branded toilet soaps. The company purchased raw grade, unprocessed Manila cocoanut oil, chiefly imported from the Philippines. It processed such oil and thereby became liable for the processing tax thereon from May 1934 to *327 June 30, 1938. It was also liable for excise taxes on toilet preparations from December 1934 to June 30, 1938. The aggregate amount of both processing and excise taxes, including all penalties and interest thereon, was $319,255.84. Of this sum $49,581.97 representing processing taxes and $39,303.74 excise taxes from January 1 to June 30, 1938, inclusive, and $14,449.87 was the amount of interest accrued during 1938 on the taxes due prior thereto. The company did not contest or challenge their correctness or its liability for their payment. The company failed to pay the taxes. Due to its financial condition it made various offers of compromise, the first in February 1938 and the latest amended offer on March 22, 1939. On May 9, 1939 the Commissioner of Internal Revenue, with the approval of the Secretary of the Treasury, accepted the company's offer of $35,000 to compromise its liability for the taxes, penalties and interest as set forth, and the company was released from such liability. The company's offers in compromise were based on its inability to pay. The compromise payment of $35,000 was duly made. In 1938 the company accrued on its books the sum of $102,335.58, covering processing *328 and excise taxes and interest on the prior taxes, and deducted that amount from its gross income, as reported on its return for that year. The Commissioner allowed $11,219.04 of the $102,335.58, as representing the proportionate part of the $35,000 compromised payment attributable to the year 1938. In his answer the Commissioner asserted that the company's net income for 1939 should be increased by the amount by which the deduction for 1938 exceeds the amount of the compromise payment attributable to the 1938 taxes. In its income tax return for 1939 the company deducted $127,359.92 for depreciation. Of this amount $17,359.92 represented depreciation on buildings and equipment and the remaining $110,000 was explained as follows: "Depreciation in the sum of $110,000 representing Depreciation claimed on returns for years 1928 to 1937 (both inclusive) has been deducted. During these years the Corporation sustained losses in amounts which did not afford it the benefit of Depreciation deductions claimed." The Commissioner disallowed the item of $110,000 but allowed additional depreciation of $3,400.78 on machinery, making a net disallowance of $106,599.22. In its amendment to the petition, *329 the company claimed depreciation for both taxable years on machinery and equipment purchased in 1928 for $52,155.50 but which was depreciated on neither its books nor in its income tax returns since such purchase; except in the year 1928. In 1928 it claimed and was allowed a deduction of 10 per cent for depreciation thereon. The company also claimed the deduction of allowances for reserves against depreciation in the amounts of $1,307.81 and $361.48 for the years 1938 and 1939, respectively, by reason of mathematical errors in the calculations of depreciation accounts and depreciation reserves in prior years. The company further claimed an allowance of $637 in each of the taxable year because of its improper deduction of items aggregating $6,014 from the unexhausted cost base of certain machinery and equipment. The original cost of the company's machinery and equipment purchased in 1928, but underpreciated after that year, was $52,155.50. That amount represented approximately 150 different items of machinery, piping, screw conveyor and belt, tank, ash conveyor, pump, air compressor, hoise, hammers, motors, electrical equipment, etc. No depreciation was taken on the company's books *330 or in its income tax returns except in the year 1928. A reasonable rate of depreciation thereon for both taxable years was 5 per cent. No "mathematical error" was established to overcome the presumption of the correctness of the respondent's computation of depreciation for the taxable years. In 1930 the company sold a concrete mixer for $450. In May 1935 it sold an asset costing $5,644.60 for $2,000, and in 1937 it sold an item of machinery for $20. These three articles were carried in the asset account at $500, $5,644.60 and $20, respectively. The total of such sales therefore was $2,470. The company did not credit the proceeds of these sales to its depreciation reserve. It removed the articles sold from its asset account and took losses on the sales. The company's machinery account was kept in a "mixed account". On its income tax returns for the respective years the company reported operation losses and claimed depreciation as follows: Amount of deprecia-
tion claimed covering
Buildings as well as
Losses
Machinery and
Year
Reported
Equipment
1925
1926
1927
$ 7,423.35
$ 18,327.92
1928
80,443.80
31,023.92
1929
92,805.62
28,438.92
1930
49,294.79
29,082.65
1931
56,400.61
30,344.42
1932
104,485.91
32,814.37
1933
7,871.99
34,597.81
1934
139,777.82
36,415.66
1935
72,222.24
37,053.11
1936
123,559.92
37,411.72
1937
156,248.92
4,678.79
$890,534.97
$320,189.29
*331 In 1939 the petitioner's officers and accountant consulted with J. H. Rosenbaum, its tax counsel, now in the United States Army, and upon his advice, took the deduction of $110,000 for depreciation on the company's income tax return for that year. The purpose of the repeated conferences with the tax counsel was to ascertain what tax benefit the company could obtain from prior year depreciation deductions from which it had derived no taxable benefit due to the losses sustained therein. The company's officers were familiar with the decision of the Circuit Court of Appeals for the Third Circuit in the case of Pittsburgh Brewing Co. v. Commissioner, 107 Fed. (2d) 155 (reversing 37 B.T.A. 439 decided November 7, 1939. This case was discussed with the company's tax counsel and was believed to apply to the company's situation. The company was not guilty of negligence or intentional disregard of the respondent's rules and regulations in connection with filing its income tax return for the year 1939. During the taxable years and for many years theretofore the capital stock of the company was owned in equal shares by Oscar M. Burke, *332 Frank G. Burke, Jr. and their two sisters, Martha A. Burke and Lucie B. Alcott. Oscar M. Burke was president and Frank G. Burke, Jr. was secretary and treasurer of the company. Both were directors, and since 1929 have constituted the majority of the board of directors. In 1939 the company paid to each of its two officers and directors, the petitioners, the sum of $31,000, of which $21,000 represented salary and $10,000 bonus. The respondent determined that the total salaries of $62,000 paid were excessive and disallowed $20,000 of the deduction claimed therefor. For some years prior to 1939 the company had paid to each of its two officers, Oscar M. Burke and Frank G. Burke, Jr., the sum of $15,000 as their annual salary. For 1939 the payment of the same sum was approved at the annual meeting of the stockholders held on January 19, 1939. On May 10, 1939 a special meeting of the directors authorized the payment of a special bonus of $10,000 to the president and to the secretary. On December 19, 1939, at a special meeting of the directors and stockholders, the following action was taken: "In view of the success of the Corporation during the year 1939, it was voted that the salaries *333 of the President and Secretary be increased to $21,000. for the calendar year (1939), exclusive of the bonus of $10,000. paid to each on May 10th, 1939." Oscar M. Burke is 60 years of age and has been employed by the company and its predecessor for 42 years. Frank G. Burke, Jr. is 56 years of age and has been employed by the company and its predecessor for 43 years. Both had worked for their father who had conducted the business first as the Burke Trading Company and later as the Manhattan Soap Company, until 1923, when the petitioner company was incorporated. Both sons have been engaged in the manufacture of soap during all of their business lives, with the exception of a four-year period during which Frank G. Burke, Jr. attended Yale University, and for one year thereafter during which he was in the real estate business. Oscar M. Burke and Frank G. Burke, Jr. were the only officers of the company and devoted all of their time to its business. They did all executive work, negotiated all credits for the company, directed the sales and services, including advertising, and had joint charge of all of its activities. They occupied the same office. They exercised direction and control *334 of the plant operation at Bristol, Pennsylvania. The plant was in charge of a local manager who was under the direct supervision of the two officers and was paid a salary of $12,000 a year. The petitioners were in regular telephonic touch with the plant twice a day, sometimes oftener, and visited the plant at least once every two weeks. In 1939 the company had 353 employees, more than twice the personnel it employed in 1936. It carried on its books several thousand accounts for soap sold in every State in the United States. It expended $557,978 for advertising. It manufactured about 90,000,000 cakes of soap in 1939 and had gross sales of $2,929,213.39. The sales in 1939 were more than twice those made in 1937 The business of the company increased rapidly in 1939, 1940 and 1941, and resulted in a considerable operating profit in those years. The company had paid no dividends up to and including 1939. In 1940 and thereafter it has declared substantial dividends. During 1939 the petitioners, Oscar M. Burke and Frank G. Burke, Jr., were indebted to the company in the amounts of $19,764.68 and $42,725.26, respectively. These amounts covered advances made by the company to them from 1927 *335 in excess of the salaries regularly paid to them. On December 28, 1939 each petitioner paid one-half of the amount due from him to the company and each borrowed the needed money from their sister Martha. The remaining half was waived by the company pursuant to a compromise offer and was charged off to surplus on the company's books. The creditors of the company insisted that the accounts against the petitioners be liquidated and removed from the company's balance sheet, and threatened foreclosures if that procedure were not followed. The creditors agreed to the compromise settlement. At the time of the settlement Frank G. Burke, Jr. had liabilities of about $60,000 and assets consisting of the company's stock, stock in Burke Farms, Incorporated, personal household effects, clothing, etc., worth less than $5,000 and about $500 in cash. The stock of Burke Farms, Incorporated, then had no value. At the time of the compromise of Oscar M. Burke's debt to the company, he had assets consisting of company stock, stock in Burke Farms, Incorporated, household furniture, etc., worth about $2,000 and about $500 in cash. He had current liabilities of about $2,700 and past due liabilities of *336 $30,519.09. His brother Frank owed him $15,000 but he did not include it among his assets. In his notices of deficiency the respondent included $9,882.34 in the income of Oscar M. Burke and $21,362.63 in the income of Frank G. Burke, Jr. as income derived from the cancellation of indebtedness. On their income tax returns for 1939 the petitioners, Frank G. Burke, Jr. and Oscar M. Burke, claimed deductions of $2,000 and $1,000, respectively, for traveling and entertaining expenses. In each case the respondent reduced the amounts allowed for such purposes by $500. The balance sheets of the company at December 31, 1938 and December 31, 1939 are as follows: December 31, 1938 ASSETS
Current Assets: Cash
$ 12,122.47
Accounts receivable
Pledged as collateral to advances received from
factors
$ 95,318.44
Accounts receivable
Miscellaneous
7,405.18
$102,723.62
Less reserve for doubtful and consigned accounts
13,727.62
88,996.00
Inventories
279,269.00
Total current assets
$ 380,387.47
Investment on rental real estate
10,000.00
Plant property: Land
59,750.00
Buildings - less reserve for depreciation $144,427.58
440,395.56
Machinery and equipment - less reserve for depre-
ciation $102,040.90
198,440.23
Automobile and auto truck - less reserve for depre-
ciation
748.76
Total plant property (less reserves)
699,334.55
$1,089.722.02
Deferred Accounts: Accounts receivable from officers, stockholders and others
$ 88,777.14
Inventory of stationary and supplies
600.00
Unexpired insurance premiums
6,474.92
Investment
300.00
Total deferred accounts
96,152.06
$1,185,874.08
LIABILITIES
Current Liabilities: Accounts payable - trade
$ 59,106.96
Accounts payable - to brokers and salesmen
768.36
Notes payable
210,000.00
Advances from factors
91,754.23
Federal taxes: Processing oil tax (including $32,940.88 interest)
251,829.39
Manufacturers excise tax (including $10,458.12 interest)
67,271.86
Old age benefits and unemployment insurance taxes
3,636.00
State unemployment insurance taxes
1,876.27
Interest on mortgages
15,210.00
Accrued wages and expenses
5,546.30
Total current liabilities
$ 706,999.37
Mortgages Payable: On plant property
$ 234,000.00
On other property
5,750.00
Total mortgages payable
239,750.00
Reserves: For co-operative advertising with customers
25,000.00
For decline in prices
5,000.00
For jobbers salesmen bonuses
5,000.00
For unredeemed merchandise coupons
2,000.00
Total reserves
37,000.00
$ 983.749.37
Capital Stock: Common - no par value, authorized issued and out-
standing, 5000 shares
5,000.00
Capital Surplus: Arising from appraisal of plant
$338,855.15
Arising from reappraisal of Elmhurst property
1,250.00
Arising from cancellation of indebtedness
159,834.92
Arising from acquisition of notes payable
109,663.53
Arising from acquisition of preferred stock
390,000.00
Total capital surplus
999,603.60
1,004,603.60
Less deficit
850,339.21
154,264.39
Profit for 12 months, 1938 (before taxes)
47,860.32
Balance of capital
202,124.71
$1,185,874.08
$17,348.06 - 1938 Federal income and excess profits
tax is not listed as a liability.
*337 Consolidated Balance Sheet December 31, 1939
CURRENT ASSETS:
Cash in banks and on hand
$ 53,063.18
Accounts receivable, trade
$287,177.22
Less, reserve for doubtful accounts
8,500.00
278,677.22
Accounts receivable, salesmen
1,991.63
Inventories (at cost or market, whichever lower): Finished and partly finished product
270,332.48
Raw materials and supplies
145,719.09
416,051.57
Deposits on purchases of raw materials
10,036.00
TOTAL CURRENT ASSETS
$ 759,819.60
CAPITAL ASSETS: Land - appraisal value
$ 59,750.00
Buildings - appraisal value, plus additions since appraisal, less
depreciation to date
407,037.16
Machinery and equipment - appraisal value, plus additions since
appraisal, less depreciation to date
219,639.39
House and land at Elmhurst, N. Y. - at tax assessment valua-
tion
10,000.00
Automobile and truck - at cost, less depreciation
588.19
TOTAL CAPITAL ASSETS
$ 697,014.74
DEFERRED CHARGES: Unexpired insurance premiums
995.39
Office supplies and postage on hand - estimated
600.00
Deposit with Philadelphia Manufacturers Mutual
Fire Insurance Co.
$6,784.80
Less, reserve for premiums to date (arbitrary
reserve set up on books)
515.40
6,269.40
TOTAL DEFERRED CHARGES
7,864.79
TOTAL ASSETS
$1,464,699.13
*338 LIABILITIES
Reserve for Federal Income Tax for calendar year 1939
$ 20,895.57
Reserve for Federal Processing Tax (for December 1939)
11,736.33
Loans payable - factors
260,485.78
Notes payable - trade
92,421.80
Accounts payable - trade
161,296.38
Accounts payable - salesmen and brokers
919.28
Accrued expenses
13,085.20
Loans payable (individuals)
150,000.00
Reserve for price decline allowances
5,000.00
Reserve for merchandise coupons
2,000.00
Reserve for advertising allowances
30,000.00
Mortgages: On plant and machinery
$234,000.00
On house and land at Elmhurst, N. Y. (past due)
5,750.00
239,750.00
TOTAL LIABILITIES
$ 987,590.34
Common Stock
5,000.00
$ 992,590.34
The financial condition of the company at the time of the offers to compromise made in February and March 1939 was substantially the same as that shown on the balance sheet on December 31, 1938, the total liabilities being slightly higher. The current liabilities shown on both balance sheets were all fixed and determined with the exception of certain estimated reserves amounting to $37,000. The mortgages were past due. The fair market value of the following *339 asset items on the 1938 balance sheet was as follows: Accounts receivable (collaterally
pledged)
$ 90,552.52
Land, buildings and machinery (at
the end of 1937)
283,118.00
Accounts of officers
31,244.92
$404,915.44
The fair market value of the company's land, buildings and equipment on December 31, 1939 was $326,354. The forced sale value of such property at the end of 1937 was $66,000. On March 22, 1939 it was about $100,000, and on December 31, 1939 about $125,000. On March 22, 1939 the fair market value of the deferred accounts due from officers was $31,244.92. During 1938, on March 22, 1939, on May 9, 1939, and at December 31, 1939 the Manhattan Soap Company was insolvent. Opinion VAN FOSSAN, Judge: The first issue involves the deductibility of $102,335.58 due from the company for Federal processing oil and manufacturers excise taxes, with interest, accrued in 1938. The respondent originally allowed $11,219.04 of this amount, representing the proportionate part of the amount paid in compromise, $35,000, attributable to that year. He also determined that "no taxable income was realized in 1939 through the compromise in that year of processing and excise taxes allowed *340 as deductions in prior years." He now changes his position, and argues that such accruals for 1938 were properly adjusted by him, but, if not, the company realized taxable income by reason of the compromise payment. The petitioner company's contention is that in 1938 it became liable for the taxes and interest in question and that hence they were properly accruable on its books and deductible from its gross income for that year. It maintains further that the cancellation of the entire liability of $319,255.84 by the payment of $35,000 as a compromise constituted a forgiveness of the indebtedness for which no consideration was given. Finally, it asserts that it was insolvent both before and after the compromise settlement and that hence no taxable income arose therefrom. Both the petitioner and the respondent cite many cases in support of their respective theories. Some of those cases resemble the case at bar somewhat closely but none is on all fours with it. In the situation before us we find that all of the events which rendered the company liable for the payment of the 1938 taxes and interest occurred within that year. See United States v. Anderson, 269 U.S. 422. *341 The taxes and interest were definite, correct and valid obligations, and the company was entitled to accrue them on its books during 1938. Dixie Pine Products Co. v. Commissioner, 64 S. Ct. 364; Security Flour Mills Co. v. Commissioner, 321 U.S. 281. See I.T. 3635, I.R.B. 1944 No. 2 for Commissioner's most recent ruling. In the second phase of this issue, presented in a somewhat alternative form, the respondent asserts in his answer that the company compromises its "miscellaneous" taxes for 1938 and prior years by the payment of $35,000 and prays that the company's taxable income be increased by the excess over that sum attributable to the 1938 taxes. The burden of proof therefore is on him. He has failed to sustain that burden, but has contented himself with answering and attempting to disprove the evidence and arguments presented by the company. The company contends that the compromise resulted in a "forgiveness" of a debt and, hence, is not taxable under the doctrine of Helvering v. American Dental Co., 318 U.S. 322; that by the acceptance of the compromise offer the government *342 automatically determined that the company was insolvent and that in any event the company was insolvent both beffore and after the compromise was effected. The principle set forth in the American Dental Co. case was couched in the following language: The release of interest or the complete satisfaction of an indebtedness by partial payment by the voluntary act of the creditor is more akin to a reduction of sale price than to financial betterment through the purchase by a debtor of its bonds in an armslength transaction. In this view, there is no substance in the Commissioner's differentiation between a solvent or insolvent corporation or the taxation of income to the extent of assets freed from the claims of creditors by a gratuitous cancellation of indebtedness. * * * * *
The fact that the motives leading to the cancellations were those of business or even selfish, if it be true, is not significant. The forgiveness was gratuitous, a release of something to the debtor for nothing, and sufficient to make the cancellation here gifts within the statute. No distinction is made between the government and any other creditor. The respondent argues that the government can not make *343 a "gift." Assuming that proposition to be true, it does not follow that the settlement made pursuant to statutory authority was not in the nature of a gift and was not "akin to a reduction" of the tax imposed. We believe that the basic principle of the American Dental Co. case is applicable to the situation before us. See Security Flour Mills Co. v. Commissioner, 135 Fed. (2d) 165, affirmed 321 U.S. 281. From the record here made, we are convinced that the company was insolvent during 1938 and in 1939 up to May 9, 1939, and also was insolvent after the compromise payment was made. Expert witnesses testified in great detail concerning the company's land, machinery and equipment and its fair market value at December 31, 1938. Those assets were carried on the company's books at approximately $700,000 but were actually worth only about $31,000 at the time of the compromise. The entire assets of the company were worth approximately $426,000 less than the balance sheet shows, or about $759,000. The liabilities currently payable totaled about $946,700. Therefore, the liabilities exceeded the assets by about $187,000. Approximately *344 the same situation existed at the time of the compromise. We have found as a fact that during 1938, on March 22, 1939, on May 9, 1939, and at December 31, 1939 the company was insolvent. In view of this finding the respondent is precluded from adding any amount to the company's taxable income for 1939 by reason of the cancellation of prior and current processing and excise taxes in excess of the $35,000 paid in compromise. Highland Farms Corporation, 42 B.T.A. 1314; Lakeland Grocery Co., 36 B.T.A. 289; Dallas Transfer and Terminal Warehouse Co. v. Commissioner, 70 Fed. (2d) 95. Cf. Lutz & Schramm Co., 1 T.C. 682; Ernst Kern Co., 1 T.C. 249. The second issue presents the depreciation allowances properly deductible in both taxable years. The major item is the $110,000 representing depreciation claimed by the company on its income tax returns for the years 1928 to 1937, inclusive, during which, with the exception of 1933, the company sustained losses greater than the amount of depreciation appearing on such returns. The company, *345 therefore, received no tax benefit from such depreciation deductions and now seeks to be permitted to deduct that amount in 1939, a year during which the deduction would have been of great value. The same basic principle was involved in Virginian Hotel Corporation of Lynchburg v. Helvering, 319 U.S. 523, rehearing denied October 12, 1943. The Supreme Court decided adversely to the taxpayer. In its opinion the Court referred to the case of Pittsburgh Brewing Co. v. Commissioner, 107 Fed. (2d) 155, decided March 7, 1939, in which the decision of the Circuit Court of Appeals for the Third Circuit was in conflict with the decision of the Circuit Court of Appeals for the Fourth Circuit, from which the Virginian Hotel Corporation case was appealed. Therefore, upon the authority of the Virginian Hotel Corporation case we deny the allowance of the $110,000 so claimed. The record discloses that capital assets costing $52,155.50 were purchased by the company in 1928 but that, with the exception of the year 1928, no depreciation was taken by the company either on its books or in its income tax return. It is obvious that *346 depreciation of such assets is allowable during their economic life even though it was not taken in prior years. Upon all the facts submitted, we believe that an annual depreciation rate of 5 per cent is reasonable for such assets. Therefore, the company is allowed a depreciation of 5 per cent for both taxable years on its machinery and equipment costing $52,155.50. The petitioner's counsel has presented an elaborate argument, augmented by tables and many figures, for the purpose of showing that the company was entitled to additional depreciation allowances due to "mathematical errors" and improper bookkeeping entries. Without engaging in any detailed discussion of the petitioner's theories, we find that it has failed completely to overcome the presumption of the correctness of the respondent's action. Furthermore, we are not impressed with the company's position with respect to the articles sold in 1930, 1935 and 1937. In fact, the method of bookkeeping which it advocates seems to be entirely erroneous. No additional depreciation allowances can be extracted by the suggested correction of its books. The third issue presents the reasonableness and proper allowance of officers' salaries *347 for the year 1939. It is patent that the company was a family corporation. It was managed and operated originally by Frank G. Burke, Sr., aided by his two sons. After the father's death the entire responsibility and burden of the enterprise devolved upon them. They had devoted their business careers to the manufacture of soap and gave their personal attention to all phases of the business. During the depression years the company's operating losses were heavy but the officers kept the concern going. In 1939 the business showed marked signs of recovery. Ninety million cakes of soap were produced. Sales were over twice the 1937 sales and aggregated nearly $3,000,000. The total salaries paid to officers, $62,000 in all, were not excessive for a company of the size and sales volume of petitioner. They are allowed. We find nothing in the record justifying the imposition of a 5 per cent penalty for negligence, as argued by the respondent in his brief, or for "intentional disregard of rules and regulations," as stated in his notice of deficiency. The possibility of the allowance of the claimed depreciation of $110,000, in whole or in part, existed until the decision of the Supreme Court *348 in the Virginian Hotel Corporation case. In the Pittsburgh Brewing Co. case, familiar to the company and its counsel, the decision of the Circuit Court of Appeals for the Third Circuit, in which the company filed its income tax return for 1939, might well have afforded the company the hope, if not the belief, that it could utilize in the current year the amounts of depreciation of which it had not received a tax benefit in prior years. The petitioner consulted its tax counsel, who advised the course pursued, and the company indicated on its tax return the basis of the deduction. There is nothing to impute bad faith to the taxpayer, nor to charge it with an attempt to evade the payment of its proper income taxes. The imposition of the penalty is not approved. The remaining two issues relate to the cases of the individual petitioners. The first presents the taxability of amounts representing cancelled portions of their indebtedness to the company. For a number of years the company had carried accounts against the petitioners covering amounts advanced or lent to them. The company's creditors insisted that the accounts should be liquidated. A compromise proposal of 50 per cent *349 was offered and, with the creditors' approval, was accepted by the company. The petitioners were forced to borrow in order to pay the agreed amounts in settlement. Under the doctrine of the American Dental Co. case, supra, the amounts forgiven or cancelled by the company did not constitute taxable income. Furthermore, at the time of the settlement the record shows that both the petitioners were in an insolvent condition. Thus, under the theory of the Lakeland Grocery Co. case, supra, in no event would the sum in controversy be taxable. The second issue involves the deductibility of traveling and entertainment expenses claimed to have been expended by the petitioners in connection with their business. The record fails to disclose any basis for disturbing the respondent's action. Both petitioners had only a vague notion of the amounts and specific purposes of the expenditures and had no knowledge of the dates of disbursement. Each offered only an indefinite estimate of the amounts which he claimed to have spent. The respondent made reasonable allowances. The testimony in the case at bar does not justify increased deductions. Decisions will be entered under Rule *350 50.