Jefrane, Inc. v. Commissioner.
Jefrane, Inc. v. Commissioner
Docket No. 3519.
United States Tax Court
1943 Tax Ct. Memo LEXIS 327; 4 T.C.M. (CCH) 481; T.C.M. (RIA) 45158; May 3, 1943
*327 Louis Smilansky (an officer), 500 Fidelity Bldg., Detroit, Mich. John H. Pigg, Esq., for the respondent. DISNEY
Memorandum Findings of Fact and Opinion DISNEY, Judge: This proceeding involves deficiencies for the calendar year 1940 in income tax ($4,216,81), declared value excess profits tax ($3,322.17), excess profits tax $2,448.66), and a delinquency penalty ($612.17). The first issue presented arises out of the adjustment made by the Commissioner to petitioner's net income by the addition thereto of the sum of $21,537.27, designated "Net short-term gain." The explanation for this adjustment contained in the deficiency notice is as follows: Taxable gain in amount of $21,537.27 was realized in the year 1940 upon the exchange of stock of the new Whittier Corporation for improved real estate (garage property). It is held that the acquisition of the Universal Service Garage from the Elless Company, bankrupt, was not in pursuance of a plan of reorganization with the purview $ of section 112 (b) (4) of the Internal Revenue Code, nor was it a transaction falling within the purview of section 112 (b) (5) of the Internal Revenue Code, since no property of the bankrupt company was transferred *328 to you solely for stock or securities. Therefore, the gain on disposition of the stock of Whittier Corporation in connection with this transaction is included in taxable income. The second issue is whether the petitioner may deduct real estate taxes paid by it upon the Universal Service Garage after acquisition. Findings of Fact We adopt as part of our findings herein the stipulation filed by the parties. The following is a summary of those stipulated facts, together with additional facts, found from evidence adduced at the hearing. Petitioner is a Michigan corporation, with its principal office in Detroit, Michigan. Its return for the taxable year 1940 was filed with the collector of internal revenue for the district of Michigan at Detroit. Petitioner was organized on April 11, 1940, as part of the reorganization of the Elless Company (hereinafter sometimes referred to as Elless) which on August 5, 1935, had filed with the District Court of the United States for the Eastern District of Michigan, Southern Division (hereinafter referred to as the District Court), its petition for "Reorganization under Section 77-B of the Bankruptcy Act." On September 11, 1935, Frank W. Blair (hereinafter *329 referred to as Trustee) was appointed temporary trustee of Elless and subsequently his appointment was made permanent. The principal assets of Elless Company consisted of the land and buildings comprising the Whittier Apartments (hereinafter sometimes referred to as the Old Whittier), the New Whittier, and the Universal Service Garage (hereinafter referred to as the Garage). The Old Whittier was built in 1922 by Elless. It is an eight-story furnished apartment building. It was originally subject to a first mortgage securing an issue of bonds in the aggregate face amount of $1,250,000, of which $861,000 in principal amount was outstanding, unsubordinated and unpaid on January 15, 1938. These bonds were sold by S. W. Strauss & Company. No interest or principal had been paid to the holders of these bonds since January 3, 1931. The New Whittier was built in 1925 by Elless. It is a fourteen-story modern furnished apartment hotel. It was originally subject to a first mortgage securing an issue of bonds in the aggregate face amount of $2,500,000, of which $2,487,100 in principal amount was outstanding, unsubordinated and unpaid on January 15, 1938. These bonds were sold by the American *330 Bond and Mortgage Company. Elless paid all interest coupons maturing on these bonds on, and prior to. November 15, 1928, except a balance of $17,478.90, due on account of the coupons which matured on that date. Both the Old Whittier and the New Whittier were also encumbered by a blanket second mortgage originally securing a bond issue for $350,000. The bonds were sold by the American Bond and Mortgage Company and approximately $164,000 in principal amount was outstanding on January 15, 1938. The Garage was originally subject to a first mortgage securing an issue of bonds in the aggregate face amount of $250,000, of which $246,065.08 in principal amount was outstanding, unsubordinated and unpaid on January 15, 1938, and $230,000 was unpaid on October 31, 1939. These bonds were sold by S. W. Strauss & Company. All the mortgages were direct obligations of Elless and were personally guaranteed by Louis Smilansky, who, on September 11, 1935, jointly with his wife, owned and held the entire outstanding capital stock of Elless, except for two qualifying shares. The trust mortgages each had a named trustee. The trustees named in the American Bond & Mortgage Co. mortgages were different *331 from the trustees named in the S. W. Strauss & Co. mortgages. Elless voluntarily surrendered possession of these properties to the trustees under the various bond issues, in June 1929. On April 12, 1938, the District Court approved, confirmed and directed the execution of an amended plan of reorganization, affecting only the hotel properties (the Old Whittier and the New Whittier). This plan (to which we shall hereinafter refer as the Hotel Plan) was adopted by a committee representing the bondholders of the New Whittier and by a bondholders' committee representing the Old Whittier and Jointly submitted by these committees to their respective bondholders and to all creditors and to the District Court. The preliminary statement, which is a part of the Hotel Plan, provides in part as follows: "As a result of independent investigations and after numerous conferences both Committees finally determined that it would be advantageous to their respective bondholders if a joint plan of reorganization for the NEW WHITTIER and THE WHITTIER [the Old Whittier] were proposed so as to assure the operation and management of both properties as a single enterprise. * * *" The Hotel Plan provided, *332 inter alia, for the organization of a new corporation with an authorized capital consisting of 38,242 shares of common stock, and for the conveyance by deed from the Trustee to the new company of the hotel properties, free and clear of all claims and liens whatsoever, except unpaid taxes. It further provided that 34,418.56 shares, representing no less than 90 per cent of the issued and outstanding stock of the new company, were to be issued to the holders of unsubordinated first mortgage bonds of the New Whittier and of the Old Whittier; that 3,823.44 shares, representing not more than 10 per cent of all the stock to be issued, and $2,000 in cash were to be allotted to the remaining creditors of Elless (except the holders of the bonds secured by the trust mortgage on the Garage), and to its stockholders. The plan also provided for the creation of a stock trust for the 34,418.56 shares. Louis Smilansky withdrew his claim against Elless in the amount of $929,128.96 on condition that the Hotel Plan be confirmed. On April 12, 1938, the District Court approved and confirmed and directed the execution of the Hotel Plan. The new company was organized on April 21, 1938, under the laws *333 of the State of Michigan, under the name of Whittier Corporation, with an authorized capital stock consisting of 38,242 common shares of no par value. The price fixed for sale in the articles of incorporation was $70 per share. The Old Whittier and the New Whittier were conveyed to this corporation, and its stock (or voting trust certificates representing such stock) was issued to all of the creditors of Elless, except the holders of the bonds secured by the trust mortgage on the Garage, and to all the stockholders of Elless as follows: 90 per cent of the stock of Whittier Corporation was issued to the holders of the unsubordinated bonds secured by the first mortgages on the Old Whittier and on the New Whittier, such stock being issued at the rate of one share for each $100 in principal amount of bonds. The remaining 10 per cent of this stock, consisting of 3,823.44 shares, was issued to the holders of the bonds secured by the second mortgage covering the Old Whittier and the New Whittier at the rate of one share for each $300 in principal amount of bonds and to various governmental authorities, other creditors of Elless, and to the stockholders of Elless, the stockholders receiving *334 1,979.80 shares. The Hotel Plan was fully consummated June 1, 1938. At the time of the adoption of the Hotel Plan, as stated in the preliminary statement, it was agreed that the Garage property could and should be reorganized separately. The preliminary statement also provided in this respect as follows: "* * * The Plan of Reorganization Hereby Submitted Does Not Propose to Affect the Reorganization of This Property [Universal Service Garage] Since It Forms No Integral Part of the New Whittier or The Whittier and Has a Present Value Substantially Less Than the Outstanding First Mortgage Indebtedness, and in the Opinion of Both Committees It Would Serve the Best Interests of All parties if Said Property Were Independently Reorganized." The court order approving and confirming the Hotel Plan provided that the right of the bondholders of the Garage were not to be affected. The following considerations entered into the decision to reorganize the hotel properties and the Garage property separately: The appraised valuation of the hotels in proportion to their debts was much better than the appraised valuation of the Garage in proportion to its debts. The bondholders of the New Whittier *335 were not interested in the Garage property. It was desired to allow the bondholders of the hotels to be in control and manage those properties, rather than the former stockholders of Elless. It was further desired to permit the bondholders of the Garage to become shareholders of Whittier Corporation and to obtain for the stockholders of Elless the Garage property free of the mortgage, but subject to taxes, which amounted to approximately $20,000. It was necessary to obtain a loan to pay these taxes to prevent the City of Detroit from foreclosing. The general plan of reorganizing Elless by treating the hotel properties separately from the Garage property, by causing the stock of Whittier Corporation to be held to the extent of 90 per cent by the bondholders of the Old Whittier and of the New Whittier, by divesting the bondholders of the Garage of any interest in the Garage property and substituting in lieu thereof some interest in Whittier Corporation, and finally, by obtaining the Garage property for the stockholders of Elless, subject only to a new mortgage to secure the loan to be obtained to pay the taxes to the city, was formulated in 1938 simultaneously with the formation of *336 the Hotel Plan under which Whittier Corporation was organized. Only such details as the ability to obtain the necessary loan with which to pay these taxes left the fulfillment of the over-all plan for the reorganization of Elless in doubt. Certificate No. 120 for 1,380 shares of Whittier Corporation was issued on March 21, 1940, to and in the name of Louis Smilansky and Harriet Smilansky, his wife, as joint tenants with right of survivorship and not as tenants in common. Louis Smilansky had agreed in 1938, when Whittier Corporation was organized and the Hotel Plan was adopted, to set aside 1,380 shares of the 1,979.80 shares of Whittier Corporation, which he was to receive under that plan for distribution to the bondholders of the Garage on the basis of.6 of a share of stock for each $100 bond held by such bondholder. The issuance of these 1,380 shares to Louis Smilansky and his wife was merely an intermediate procedural device in the plan, the ultimate purpose of which was to obtain the Garage property for the stockholders of Elless and to allow the bondholders of the Garage to become stockholders in Whittier Corporation. The Garage being a single-purpose building, it was impossible *337 to obtain the necessary loan with which to pay the back real estate taxes to the city, except from the Reconstruction Finance Corporation (hereinafter referred to as the R.F.C.), which insisted on a corporate mortgagor as a condition for making the loan. Jefrane, Inc., the petitioner herein, was organized to comply with that condition. Negotiations for this loan were carried on by Louis Smilansky, and the $20,000 mortgage obligation was signed by petitioner and guaranteed by Louis Smilansky and his wife. Petitioner, as previously stated, was organized on April 11, 1940, under the laws of the State of Michigan. Its total authorized capital stock consisted of 1,000 shares of common no par value, and the articles of incorporation recite that the book value per share is $95. All of petitioner's stock was subscribed for and issued to Louis Smilansky and Harriet Smilansky, his wife, as joint tenants with right of survivorship and not as tenants in common. According to the terms of the initial subscription agreement, dated April 8, 1940, Louis Smilansky and his wife agreed to pay for these shares by obtaining for the corporation a deed to the Garage property. After the mortgage with the *338 R.F.C. had been completely negotiated, a plan for the reorganization of the Garage property (hereinafter referred to as the Garage Plan) was submitted by the Trustee of Elless to the District Court for approval on or about October 31, 1939. In the preliminary statement, which is part of the Garage Plan, the following statements are made: "* * * Mr. and Mrs. Smilansky have conveyed 1,380 shares of their stock in Whittier Corporation to Jefrane, Inc., a Michigan corporation, of which Mr. and Mrs. Smilansky are organizers and officers. Jefrane, Inc. has offered to purchase from the Trustee of The Elless Company, the Universal Service Garage subject to outstanding taxes, together with all of the cash in the hands of the Trustee derived from the rentals of the Universal Service Garage, and together with all personal property situated in said garage, and all accounts receivable of the Trustee and the debtor from the tenants of said garage. Jefrane, Inc. is to pay therefor by assigning to the Trustee 1380 shares of the capital stock of Whittier Corporation and to pay to the Trustee the sum of $5,000.00, to be used for the payment of the fees and expenses of the Bondholders' Protective Committee, *339 the Trustees under the trust mortgage encumbering the Universal Service Garage, the depositary for said Committee and their attorneys, agents and employees. If the proposal of Jefrane, Inc. is accepted, the Trustee will have 1380 shares of the capital stock of Whittier Corporation to distribute to the holders of Universal Service Garage bonds. Since the Trustee of the opinion that the present value of Universal Service Garage is much less than $230,000.00 (principal amount of outstanding unsubordinated bonds), the Trustee proposes that the stock of Whittier Corporation to be received by the Trustee shall be distributed solely among the holders of unsubordinated bonds, and to distribute nothing to the holders of subordinated bonds and coupons or stockholders of The Elless Company. If such plan is carried out the stock of Jefrane, Inc. to be received by the Trustee will be sufficient to distribute one share of stock for each $166.66 2/3 in principal amount of unsubordinated bonds, or approximately.6 shares of stock for each $100.00 in principal amount of unsubordinated bonds." The Garage Plan further provided that no creditors of Elless were to participate under the Garage Plan, except *340 the holders of unsubordinated bonds secured by the trust mortgage on the Garage; that neither stockholders of Elless nor holders of subordinated bonds were to participate in this plan in any way; and that the costs and expenses of administration of the debtor's estate and all other allowances were to be limited to the sum of $5,000, to be paid to the Trustee of the debtor by Jefrane, Inc. The Garage Plan was confirmed by the District Court on March 6, 1940. The order of the District Court confirming the Garage Plan provided, in part, as follows: "11. That Frank W. Blair, Trustee appointed in this proceeding, be and he is hereby authorized to accept from Jefrane, Inc., a Michigan corporation, the sum of $5,000.00 and 1,380 shares of the capital stock of Whittier Corporation, a Michigan corporation, pursuant to said plan of reorganization. "12. That upon such payment being made and such stock being transferred as provided in paragraph 11 hereof, said Frank W. Blair, Trustee, (a) Shall make, execute and deliver to Jefrane, Inc., a Michigan corporation, a good and sufficient deed conveying to said Jefrane, Inc. all of the right, title and interest of the debtor and of said Trustee *341 in and to Universal Service Garage Building * * *. * * * * *
(b) Shall pay to Jefrane, Inc. all cash then remaining in the hands of said Trustee derived from the operation of said Universal Service Garage; and (c) Shall assign to said Jefrane, Inc. all claims of the debtor and/or said Trustee against any tenants or former tenants of said Universal Service Garage for any sums owing to said debtor and/or said Trustee out of the occupancy of said garage by such tenants or former tenants. "The execution and delivery of the deed described in sub-paragraph (a) of this paragraph shall be an acknowledgment by said Frank W. Blair, Trustee, that Jefrane, Inc. has paid to said Frank W. Blair, Trustee, the sum of $5,000.00 and has transferred said 1,380 shares of the capital stock of Whittier Corporation pursuant to the provisions of paragraph 11 hereof. * * * * *
"14. * * * The holders of the present unsubordinated bonds of the debtor secured by said trust mortgage shall be entitled to receive in full and complete satisfaction thereof the new securities provided for in said plan of reorganization, to-wit,.6 shares of stock of Whittier Corporation for each $100.00 face principal amount *342 of Universal Service Garage unsubordinated bonds; * * * "15. The sum of $5,000.00 to be paid Frank W. Blair, Trustee, by Jefrane, Inc., as provided in said plan of reorganization, shall be held by said Frank W. Blair, Trustee, of the payment of the fees and expenses of the Trustee under said mortgage and their counsel, the Committee representing the holders of Universal Service Garage unsubordinated bonds and their counsel and secretarial agents, and such expenses as may hereafter be incurred by said Frank W. Blair, Trustee, in completing the consummation of said plan of reorganization." The Garage Plan was fully consummated in substance in accordance with the terms thereof and with the order of the District Court dated March 6, 1940. The mechanics employed to accomplish this result were as follows: Certificate No. 120 for 1,380 shares of Whittier Corporation was endorsed in blank on April 19, 1940, by Louis Smilansky and his wife and delivered to the attorney representing Elless with instructions to deliver it to the Trustee and obtain from him a deed running to petitioner covering the Garage property. On May 9, 1940, Certificate No. 120 was delivered to the Issue Division of the *343 National Bank of Detroit for cancellation and transfer of the shares represented thereby to a reserve for issuance to the holders of Garage bonds on the order of the Trustee. The 1,380 shares of Whittier Corporation stock were distributed by the Trustee to the holders of the unsubordinated first mortgage Garage bonds on the basis of approximately.6 share of stock for each $100 principal amount of bonds. These 1,380 shares of Whittier Corporation stock were never delivered to petitioner, and petitioner never delivered them to the trustee. The petitioner never owned the 1,380 shares of Whittier stock. On April 25, 1940, the Trustee conveyed to petitioner all right, title, and interest of Elless and the Trustee in and to the Garage property. The consideration for such transfer is recited in the deed to be the payment of $5,000 and the transfer of 1,380 shares of Whittier Corporation by petitioner and receipt of such consideration is acknowledge in the deed. The $5,000 was part of the proceeds of the $20,000 loan from the R.F.C., and was paid by the Burton Abstract Company, acting as escrow agent on behalf of petitioner and Louis Smilansky personally in the form of a check drawn by the *344 R.F.C. to the order of the Trustee. In its return for the taxable (calendar) year 1940, petitioner reported no gain or loss from the transaction by which it acquired the Garage property from Elless, treating the transaction, for the purposes of the return, as a non-taxable transaction or exchange. In his determination of the deficiencies involved, the respondent determined that said property was not acquired by petitioner in pursuance of a plan of reorganization, within the meaning of section 112 (b) (4) of the Internal Revenue Code, or in a nontaxable exchange, within the meaning of section 112 (b) (5) of the Internal Revenue Code. In computing the gain determined to have been realized by petitioner on the alleged exchange, the respondent determined the basis to petitioner of 1,380 shares of Whittier stock to be $67,348.57, being the pro rata portion of the value represented by its total outstanding stock, or, expressed in figures (1380/1979.8) ($1,932,330) (.05). The assessed value of all the properties of Whittier Corporation as shown by the assessment rolls for the City of Detroit for the year 1935 is $1,932,330. The general city taxes of the City of Detroit on the Garage property *345 for the city's fiscal year, beginning July 1, 1940, and ending June 30, 1941, amounted to $2,883.71; and the county taxes of Wayne County, for the county's fiscal year beginning December 1, 1940, and ending November 30, 1941, amounted to $529.36. Petitioner paid the city taxes in two installments of $1,441.85 and $1,441.86 on July 24, 1940, and December 18, 1940. It paid the county tax of $529.36 on December 20, 1940. In its return for the taxable (calendar) year 1940, the petitioner claimed as a deduction $3,413.07, representing the taxes so paid. The respondent disallowed the deduction so claimed and added said amount to the cost basis of the property. Opinion The first issue in this case is whether the transaction by which petitioner acquired the Garage property resulted in taxable gain. The respondent's position, as explained upon brief, is that there was taxable gain, resulting from the exchange of the Whittier stock for the Garage in 1940, unaffected by the earlier plan of reorganization. The substance of this transaction is as follows: Elless, a Michigan corporation, whose principal assets consisted of two hotels and a garage, and land adjacent thereto, filed a voluntary *346 petition for reorganization under section 77-B of the Bankruptcy Act on August 5, 1935. At that time the entire capital stock of Elless was owned and held by Louis Smilansky jointly with his wife, except for two qualifying shares. One hotel (the Old Whittier) was encumbered by a first mortgage securing an issue of bonds in the face amount of $1,250,000, of which $861,000 was outstanding and unpaid on January 15, 1938; the other hotel (the New Whittier) was encumbered by a first mortgage securing an issue of bonds in the face amount of $2,500,000, of which $2,487,100 was outstanding and unpaid on January 15, 1938; both hotels were encumbered by a second mortgage securing an issue of bonds in the face amount of $350,000, of which approximately $164,000 was outstanding and unpaid on January 15, 1938; and the Garage was encumbered by a first mortgage securing an issue of bonds in the face amount of $250,000, of which $246,065.08 in principal amount was outstanding and unpaid on January 15, 1938. The reorganization of Elless was accomplished pursuant to a master plan whereby (a) the hotel properties were conveyed by the Trustee to a new corporation (Whittier Corporation) whose authorized *347 capital stock of 38,242 shares was distributed as follows: (1) To the holders of unsubordinated
first mortgage bonds of the Old
whittier and of the New Whittler
(not less than 90 per cent)
34,418.56
(2) To the holders of unsubordinated
first mortgage bonds of the Garage
1,380.00
(3) To the stockholders of Elless
599.80
(4) To the holders of the bonds secured
by the second mortgage, to various
governmental authorities, and other
creditors of Elless
1,843.64
Total
38,242.00 and (b) the Garage property was conveyed to another new corporation (Jefrane, Inc.), whose authorized capital stock of 1,000 shares was distributed to Louis Smilansky and Harriet Smilansky, his wife, as joint tenants. That part of this plan which dealt with the hotel properties further provided that $2,000 in cash be paid and allotted for the benefit of the remaining creditors of Elless (except the bondholders of the Garage property) in exchange for and full satisfaction of their respective claims, and to the stockholders of Elless; and that part of this plan which dealt with the Garage property further provided that $5,000 in cash be paid by Jefrane, Inc., to the Trustee to be held by the latter "for *348 the payment of the fees and expenses of the Trustee under said mortgage and their counsel, the Committee representing the holders of Universal Service Garage unsubordinated bonds and their counsel and secretarial agents, and such expenses as may hereafter be incurred by said Frank W. Blair, Trustee, in completing the consummation of said plan of reorganization." There is no issue in this case as to the first part of this plan whereby Whittier Corporation acquired title to the hotel properties. The issue here relates solely to the consequences for Federal tax purposes of the second part of the plan whereby Jefrane, Inc., acquired title to the Garage property. In the inquiry into that question, "the precise mechanics whereby the reorganization was consummated are not material." Bondholders Committee, Marlborough Inv. Co., First Mortgage Bonds v. Commissioner, 315 U.S. 189, 191. As was stated in United Light & Power Co. v. Commissioner, 105 Fed. (2d) 866, at page 876, certiorari denied, 308 U.S. 574, "* * * the intermediate transactions are to be disregarded, and the plan treated as an integral *349 one, with the net results achieved as the fact situation to which the statutory rule is to be applied. We are supported in this determination by the holding in Helvering v. Bashford, 302 U.S. 454, 458 * * *." So, in this case, it is the net results achieved, the master plan, as outlined above, to which the statutory rule is to be applied and we are not controlled either by the details of the Hotel Plan, confirmed by the District Court on April 12, 1938, or by the details of the Garage Plan, confirmed by the District Court on March 6, 1940. Helvering v. Alabama Asphalting Limestone Co., 315 U.S. 179. In our opinion, there was but one plan, and it included the 1940 transaction. Elless, under the plan, could not be reorganized without disposition of all of its property. That plan called for the issuance of 1,380 shares of Whittier Corporation stock to Smilansky and wife, sole stockholders of Elless, not however to be retained by them merely as stockholders of Elless, but to be used to obtain the Garage property for such stockholders of Elless and to allow the bondholders interested in the Garage to become stockholders *350 in Whittier Corporation. That idea was an integral part of the original and whole plan. Difficulties, however, stood in the way because of taxes against the Garage property and because of expenses. In order to raise $20,000 to take care of these two items, it was necessary, because of the requirements of the Reconstruction Finance Corporation, to create a corporation to execute a mortgage for the $20,000. Thus, the organization of Jefrane is seen as a mere step in the over-all plan. That plan was carried out with the final result that the former stockholders of Elless, through their stock holdings in Jefrane, owned the Garage and the former Garage bondholders owned stock in Whittier Corporation. In our opinion, that plan was carried out without the petitioner ever becoming the owner of the Whittier stock. It was not originally planned that the petitioner should become such owner. In fact, the original plan was prior to the formation of petitioner and did not call for its formation, which occurred only because of the later difficulties. Smilansky and wife, the owners and holders of the Whittier Corporation stock turned it over to the Trustee of Elless, for the Garage bondholders, in *351 consideration of the transfer to Jefrane of the Garage property, which Smilansky and wife had agreed, as consideration for their stock in Jefrane, to procure for that corporation. It is true that in the order of the District Court of March 6, 1940, the Trustee was authorized to accept the stock (and the $5,000 for expenses) from Jefrane and to convey the Garage building and appurtenances to that corporation; and that the preliminary statement as to the Garage Plan indicates that Jefrane was to receive and transfer the Whittier Corporation stock, and if, as the respondent contends, the reorganization as to the Garage property were to be considered altogether separate from the earlier transactions, such language would be indication that Jefrane did become the owner of the Whittier Corporation stock. Considering the over-all plan, however, and the object merely to get the Garage into the hands of the former stockholders of Elless and the Whittier stock into the hands of the former Garage bondholders, we think such language may not be held to overcome not only the original plan under which Jefrane was not necessary, but the fact that the Whittier stock was not, in fact, transferred to *352 Jefrane. We conclude and hold that the petitioner did not exhcange the stock of New Whittier Corporation for the Garage property. Petitioner obtained the Garage through the issuance of its own stock to Smilansky and wife, for they agreed as consideration for the stock to secure for Jefrane the Garage. Such transaction resulted in no gain to petitioner. The respondent therefore erred in determining the petitioner to be taxable upon gain from such exchange. The second issue in this case is whether petitioner is entitled, in computing its income for 1940, to deduct the amount of $3,413.07, paid to the City of Detroit and Wayne County in that year as taxes on the real property acquired by it on April 25, 1940. The county taxes of Wayne County, Michigan, for the county's fiscal year beginning December 1, 1940, and ending November 30, 1941, amounted to $529.36, and petitioner paid this tax on December 20, 1940. Respondent concedes on brief that the decision of this Court in Ernst Kern Co., 1 T.C. 249, requires a decision in favor of the petitioner as to the deductibility of this amount; and we so hold. The city taxes of the City of Detroit for the city's *353 fiscal year beginning July 1, 1940, and ending June 30, 1941, amounted to $2,883.71, and petitioner paid these taxes in two installments of $1,441.85 and $1,441.86 on July 24, 1940, and December 18, 1940. Respondent contends on brief that the decision in Ernst Kern Co., supra, "requires a decision in favor of respondent in respect of the presently involved Detroit City taxes." The parties have stipulated that applicable provisions of the Charter of the City of Detroit are identical with those set forth in the findings of fact in Ernst Kern Co., 1 T.C. 249, 259-260; and they are therefore incorporated herein by reference and made a part hereof. The general rule is stated at page 272 of the opinion in the Kern case as follows: * * * If, prior to May 1, 1937 [the date of the transfer of the real estate in question to the petitioner therein], any lien for payment of the taxes existed on the real estate conveyed or if the petitioner's vendor was personally liable for the taxes, the deductions must be denied. Magruder v. Supplee, 316 U.S. 394; Helvering v. Johnson County Realty Co., 128 Fed. (2d) 716. *354 [Parenthetical material supplied.] To the same effect is: Robert LeRoy, 4 T.C. 70, 73-74. This Court in the Kern case held that the taxes paid to the City of Detroit on August 2, 1937, and December 30, 1937, covering city taxes on the property for the fiscal year of the city beginning July 1, 1937, and ending June 30, 1938, were not deductible in petitioner's return for its fiscal year ended January 31, 1938, stating in connection with such holding the following: The charter of the city of Detroit in Title VI. chapter IV, and both section 7 and 27 make the tax a debt of the owner "from the time of the listing of the property for assessment" by the board of assessors. Section 3 of Title VI, chapter II, of the charter provides that every person owning taxable property shall make a list thereof for the board of assessors, and, in case of failure of such owner to do so, it becomes the duty of the assessors to assess the property upon the assessment roll, which is to be completed by April 1. In the absence of citation to and our inability to find, after diligent search, a contrary holding by the courts of Michigan, we hold that petitioner's vendor *355 became personally liable for the city taxes in question, by reason of the above provisions in the charter, on April 1, 1937, and for this reason petitioner is not entitled to the claimed deduction therefor. * * * The case of In re Ever Krisp Food Products Co., 307 Mich. 182; 11 N.W. (2d) 852, decided after the Kern case, is not in point. In the case at bar, the Garage property was conveyed to petitioner by the Trustee by a deed dated April 25, 1940. The petitioner argues that the property was acquired on March 6, 1940, the date of the order of the United States District Court settling the rights of the parties in the reorganization. The order of the District Court directing the Trustee to execute such a deed did so on the express condition that such deed be executed after payment of the $5,000 and transfer of the 1,380 shares of Whittier Corporation were made. The Trustee did not receive these 1,380 shares until after April 19, 1940, for that was the date on which Louis Smilansky and his wife endorsed in blank Certificate No. 120. Therefore, we hold that petitioner acquired title on April 25, 1940, and not before that *356 date. Thus, the only question remaining is whether under the holdings of the courts of Michigan the Trustee did not become liable for the city taxes on April 1, 1940, despite the provisions of the charter referred to in the Kern case. Petitioner, though in its principal brief agreeing that the Kern case requires a decision against it as to the city taxes, on reply brief denies this, and relies upon the case of Harrington v. Hilliard, 27 Mich. 271 (1873). In that case, the vendor was the owner of certain lands on the second Monday in May 1871. On October 31, 1871, he conveyed these lands by a warranty deed and the vendee went into possession of the land on the first Monday in December 1871. In the month of November the state, county and township taxes of that year were ascertained, assessed and imposed upon the land, and extended upon the assessment roll, as required by law. In January 1872, the vendee paid these taxes. The court stated the issue in the following words: "The only question, therefore, is whether, as between the vendor and the purchasers, the vendor was bound to pay these taxes." (Emphasis supplied.) The court held that *357 the vendee was obligated to pay the taxes for the year, 1871, because the conveyance was prior to the time when the taxes became a lien upon the land, to wit, the first Monday in December. The courts of Michigan have followed this decision consistently. Eaton v. Chesebrough, 82 Mich. 214; 36 N.W. 365; Jacobs v. Union Trust Co., 155 Mich. 233; 118 N.W. 921. Petitioner argues that this holding in the Harrington case requires a holding in the instant case that petitioner should be allowed to deduct the city taxes paid by it. However, all the decision in the Harrington case would require, if applied to the facts in the instant case, is that petitioner herein, which received a deed to the Garage property on April 25, 1940, was obligated, as between it and the Trustee from whom it received the conveyance, to pay the 1940 taxes, which became a lien on the property on July 15, 1940, and could not recover taxes so paid from its grantor. The decision in the Harrington case does not require, and petitioner, in the case at bar does not contend that it requires, *358 a holding in the instant case that under Title VI, chapter II, section 7 [1] and chapter IV, section 27 [2] of the Charter of the City of Detroit, the Trustee was not liable as of April 1, 1940, for the city taxes for that year as between the Trustee and the city. Under the applicable provisions of the Charter of the City of Detroit, the Trustee was liable to the city for 1940 real estate taxes on the Garage property on April 1, 1940, and the lien for taxes came into existence on July 15, 1940. The Trustee did not relieve himself of his liability to the city by conveying the property before the lien attached. See Magruder v. Supplee, 316 U.S. 394, and, paraphrasing the language of the Supreme Court in Magruder v. Supplee, supra, this pre-existing personal liability on the part of the Trustee is sufficient to foreclose the petitioner in the case at bar who pays the amount necessary tdo discharge the tax liability from deducting such payment as a "tax paid." There is some language in the Harrington case which appears to have some bearing on the question whether in this case the Trustee's personal liability for the *359 taxes to the City of Detroit under the provisions of the latter's charter began on July 15th, when the lien attached, rather than on April 1st. However, the wording of the statute involved in that case, which is set forth in the margin, [3] differs materially from the wording of the charter provisions, cited in footnotes 1 and 2. Furthermore, the language of the court in the Harrington case is equivocal in this respect. At one point in its opinion (p. 274) the court states that, "The fair interpretation of the statute is, that they [the taxes] become such charge on the first Monday in December, at the same time they are declared to become a lien upon the land"; but at another point in the same opinion (p. 278), the court states that "the owner when the land was taxed in the spring, or the person taxed, had always been liable personally for it, as between him and the public; but this fact in no way made him liable, as between himself and his vendee, if he conveyed the land before the lien attached." Finally, it is to be noted that both these statements are dictum; therefore, we do not regard the Harrington case as any authority for the proposition that under the provisions *360 of the charter of the City of Detroit in effect in 1940 the Trustee was not personally liable for the city taxes for 1940 as of April 1, 1940. [4]
*361 Accordingly, we hold that the deduction for the city taxes in the amount of $2,883.71 was properly denied by respondent. Decision will be entered under Rule 50. [5]
Footnotes
1. "Sec. 7. * * * All city taxes shall become a debt against the owner from the time of the listing of property for assessment by the board of assessors." ↩
2. "Sec. 27. All city taxes upon * * * real estate * * * in addition to being a lien upon the property assessed shall become a debt against the owner from the time of the listing of the property for assessment, and shall remain a debt against the owner of the property or his estate after his death, until the same are paid." ↩
3. Comp. L. 1871, ch. 21, § 40: The taxes assessed upon any real estate of any resident or nonresident, and all legal charges made thereon, shall be a charge against the person owning the same on the second Monday of May, and shall be a lien on said real estate from the first Monday in December of the year in which such real estate was assessed; but it shall be lawful for the township treasurer to collect such taxes by distress and sale of the goods and chattels of any person who shall purchase such real estate after the second Monday in May, and occupy the same on the first Monday in December. ↩
4. Upon reply brief the petitioner suggests that since the deed of April 25, 1940, is prior to the date (July 15, 1940), when the city tax became a lien against the property, "such tax is a proper charge of operations." No argument is presented. however, on the point, and we see nothing to sustain it.↩
5. The Commissioner determined a 25 per cent penalty in excess profits tax. The petition assigns no error in that respect, and any such penalty should be added to excess profits taxes under Rule 50. Under our conclusions above, however, the petitioner will apparently not be liable for excess profits taxes.↩